**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **R. ALEXANDER ACOSTA, SECRETARY** | : | **CIVIL ACTION** |
| **OF LABOR, UNITED STATES** | : | |
| **DEPARTMENT OF LABOR,[1]** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 16-1079** |
| | : | |
| **LLOYD INDUSTRIES, INC., ET AL.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

**Goldberg, J.**                                                            **December 5, 2017**

## MEMORANDUM OPINION

The Secretary of the Department of Labor, R. Alexander Acosta, brings this action on behalf of two discharged employees against their employer, Defendants Lloyd Industries Inc. ("Lloyd Industries") and William P. Lloyd ("Mr. Lloyd"), alleging violations of the Occupational Safety and Health Administration Act (the "OSH Act"), 29 U.S.C. § 660(c).

According to the Secretary, Matthew Spillane and Santa "Dino" Sanna were wrongfully terminated in retaliation for assisting the Occupational Safety and Health Administration ("OSHA") in identifying safety hazards at Lloyd Industries. The Secretary relies upon Section 11(c) of the OSH Act, which prohibits the discharge of employees because they file complaints or otherwise exercise rights afforded by the Act, including informing OSHA about unsafe conditions.

---

[1] R. Alexander Acosta, the current Secretary for the Department of Labor, has been substituted for Thomas E. Perez as the Plaintiff pursuant to Fed. R. Civ. P. 25(d).

The Secretary brings one claim of retaliation in violation of the OSH Act. Defendants have moved for summary judgment. As genuine issues of material fact exist, Defendants' motion will be denied.

## I.    FACTUAL RECORD

The issue before me is whether material undisputed facts exist to establish that Defendants' termination of Mr. Spillane and Mr. Sanna was non-retaliatory. The Secretary asserts that Mr. Spillane was fired because he took and shared photographs of a machine that caused an injury to a co-worker, leading to an OSHA complaint. The Secretary further posits that Mr. Sanna was fired because of his relationship to an employee who filed a complaint with OSHA and for testifying at an OSHA hearing. Defendants counter that the material undisputed facts establish that Mr. Spillane was terminated because he was sleeping on the job, and Mr. Sanna was terminated because his disregard for his duties to oversee OSHA compliance resulted in OSHA citations. Not surprisingly, these vastly divergent versions of events are supported by differing and disputed facts.

The parties agree on only the following facts:

-   Lloyd Industries is a small business manufacturing a variety of fire and smoke dampers, a product designed to stop the spread of fires. Founded by its owner and president, Mr. Lloyd, the company employs almost 100 individuals in two plant locations—one in Florida and one in Montgomeryville, Pennsylvania, which is the focus of the lawsuit before me. (Defs.' Statement of Material Facts ("SOF") ¶¶ 1-3; Pl.'s Statement of Material Facts ("SOF") ¶¶ 1-3.)

-   On July 11, 2014, Joshua Elbode ("Mr. Elbode"), an employee of Lloyd Industries, suffered a partial amputation of three fingers on his right hand while using a press brake machine. In late October 2014, three months after the injury, Mr. Elbode filed a complaint with OSHA. As a result, OSHA initiated an inspection of the plant, and Compliance Safety and Health Officers arrived on November 13, 2014. (Defs.' SOF ¶¶ 28-29, 31, 33-34; Defs.' Mot., Ex. 1, 27:19-28:6, 30:7-8, 34:8-24, 139:3-7, 143:6-14, 2003:17-2007:23; Id., Ex. 6; Pl.'s SOF ¶¶ 28-29, 31, 33-34.)

- Mr. Spillane, one of the fired employees, joined Lloyd Industries in May 2014. He worked with Mr. Elbode in the Access Door Department as a laborer. Following Mr. Elbode's accident, Mr. Spillane took photographs of the worksite from July 2014 through August 2014 and, at the request of Mr. Elbode's attorney, provided them to Mr. Elbode to assist with his worker's compensation matter. Rene Santos, another employee at Lloyd Industries, informed Mr. Lloyd that he saw Mr. Spillane taking these photographs. The parties also agree that Mr. Lloyd gave Mr. Spillane Phillies tickets despite learning about the photographs. (Defs.' SOF ¶¶ 35-40; Compl. ¶¶ 12, 16; Ans. ¶ 12; Defs.' Mot., Ex. 1, 1072:3-1073:19; Id., Ex. 7, 11:21-12:5; Id., Ex. 9; Id., Ex. 10, 65:23-68:11; Pl.'s SOF ¶¶ 35-40.)

- Mr. Lloyd terminated Mr. Spillane on November 18, 2014. (Defs.' SOF ¶ 52; Compl. ¶ 23; Ans. ¶ 23; Pl.'s SOF ¶ 52.)

- Mr. Sanna, another terminated employee of Lloyd Industries, is Mr. Elbode's grandfather and was hired in 2008 to work as the Montgomeryville plant manager. Mr. Sanna provided testimony to OSHA in February 2015.[2] (Defs.' SOF ¶¶ 23, 28; Compl. ¶ 30; Ans. ¶ 30; Pl.'s SOF ¶¶ 23, 28.)

- On May 11, 2015, OSHA issued numerous citations against Lloyd Industries and proposed penalties in the amount of $822,000. OSHA issued six alleged violations of 29 C.F.R. § 1910.212(a)(3)(ii), which requires the point of operation machinery to be guarded, and three alleged violations of 29 C.F.R. § 1910.95(g)(6), which requires that employees exposed to noise over 85 dBA for an eight-hour time weighted average receive annual audiometric tests. (Defs.' SOF ¶¶ 59, 61-62; Defs.' Mot., Exs. 18-19; Pl.'s SOF ¶¶ 59, 61-62.)

- On May 11, 2015, after screaming in frustration because of the OSHA citations, Mr. Lloyd fired Mr. Sanna. Mr. Lloyd testified that if the company received an $822,000 fine, "somebody gets fired." (Defs.' SOF ¶¶ 68-69; Defs.' Mot., Ex. 11, 146:18-147:4; Id., Ex. 20, 298:14-301:13; Pl.'s SOF ¶¶ 68-69.)

- Following their terminations, Mr. Spillane and Mr. Sanna both filed complaints alleging that Lloyd Industries retaliated against them in violation of the OSH Act. Upon receiving notification of Mr. Spillane's complaint, Lloyd Industries informed OSHA that it terminated Mr. Spillane because "[s]everal employees notified [Mr. Lloyd] that Mr. Spillane was punching in at 6:00 am on Saturday and Sunday's going back to his car to sleep until 8:30-9:00 am." (Defs.' SOF ¶¶ 72-73; Defs.' Mot., Exs. 21-23; Pl.'s SOF

---

[2] Defendants cite to Exhibit 27 as support for this fact, however, Exhibit 27 appears to be only a cover page of a transcript of a statement taken from Mr. Sanna on February 23, 2015. Nonetheless, Mr. Sanna stated that he provided testimony to OSHA on February 23, 2015 in a declaration. (See Pl.'s Resp., Ex. D ¶ 12.)

Citing to Mr. Sanna's declaration, the Secretary states that Mr. Lloyd was aware that Mr. Sanna provided testimony as part of the OSHA inspection. (Id.) Defendants do not contest this fact.

¶¶ 72-73.) The parties have not provided any citations to the record regarding whether Mr. Lloyd provided any explanation to OSHA regarding Mr. Sanna's termination.

The majority of the factual record is contested as follows:

- Regarding Mr. Spillane's termination, Defendants contend that Mr. Lloyd received multiple reports that Mr. Spillane slept while on the job. Mr. Lloyd was informed that Mr. Spillane would clock into work on a Saturday at 6:00 a.m., go to his car for a period of time, and then return to work before Mr. Lloyd arrived. Defendants assert that Rene Santos, another Lloyd Industries employee, told Mr. Lloyd that Mr. Spillane was sleeping in his car, as did the union shop steward Russell Murphy. (Defs.' SOF ¶¶ 43-46; Defs.' Mot., Ex. 10, 39:2-13; Id., Ex. 11, 64:6-11, 75:17-79:25.) According to Defendants, having received multiple reports of Mr. Spillane sleeping on the job, he was legitimately fired.

  The Secretary contradicts these facts by pointing to Murphy's deposition, wherein Murphy states that he did not tell Mr. Lloyd about Mr. Spillane sleeping in his car prior to termination. (Pl.'s Resp., Ex. J, 51:18-52:3.)[3]

- Defendants note that Mr. Lloyd does not have a set procedure for terminating employees, but rather usually "lets an issue fester" until he reaches a "boiling point," and then "just fire[s] them." According to Defendants, Mr. Lloyd waited to fire Mr. Spillane until more than one employee reported they had seen Mr. Spillane clock in and return to his car. (Defs.' SOF ¶¶ 53-54, 57; Defs.' Mot., Ex. 11, 35:14-21, 71:20-72:1, 86:7-87:19.)

  In response, the Secretary points to Mr. Sanna's declaration, where he states that Mr. Lloyd has a short temper and often fired employees when he became angry with them. The Secretary again flags that Russell Murphy testified he did not tell Mr. Lloyd about Mr. Spillane sleeping in his car prior to termination. (Pl.'s Resp., Ex. D ¶ 7; Id., Ex. E, 35:3-15; Id., Ex. J, 51:18-52:3.)

- As to Mr. Sanna, Defendants contend that he directed and managed all plant operations in his role as plant manager, and had additional broad responsibilities for production, maintenance, safety, quality, and other production-related activities. (Defs.' SOF ¶¶ 24, 26; Defs.' Mot., Ex. 3, 29:14-24, 39:13-21, 41:3-45:19, 49:7-16, 75:6-76:17, 93:15-94:16, 194:20-197:3, 268:24-271:24; Id., Ex. 4, 102:16-24; Id., Ex. 5, 28:8-23.) Defendants raise these facts to justify Mr. Sanna's termination.

  In response, the Secretary points to the declaration of Mr. Sanna, in which he avers that he was not responsible for safety at the plant. (Pl.'s Resp., Ex. D ¶ 10.)

---

[3] Additionally, the Secretary highlights that although Mr. Lloyd testified that Rene Santos told him about Mr. Spillane sleeping, Santos did not provide details to Mr. Lloyd, but only that he was "always sleeping in his car." (Pl.'s Resp., Ex. G, 52:5-7.) It is unclear how this alleged distinction creates disputed facts regarding whether Mr. Lloyd was informed of Mr. Spillane sleeping on the job.

- Defendants also point out that Mr. Lloyd became "incensed" when he received the OSHA citations because he believed the Montgomeryville plant was "clean as a whistle" in light of the fact that his Florida plant, which was a "clone" of the Montgomeryville plant, was also inspected by OSHA and received no citations. (Defs.' SOF ¶¶ 64-68; Defs.' Mot., Ex. 11, 142:8-143:10-25, 146:18-147:4, 148:18-149:7; Id., Ex. 20, 298:14-301:13.)

  The Secretary contests this point, citing to the transcript from the OSHA hearing where Mr. Lloyd testified that he did not "pay much attention" to OSHA rules and "delegate[s] that to other people so [he] can stay away from it." (Pl.'s Resp., Ex. C, 1668:7-14.)

- Finally, Defendants aver that Mr. Lloyd fired Mr. Sanna because he believed Mr. Sanna was responsible for ensuring the company complied with OSHA regulations. (Defs.' SOF ¶¶ 69-71; Defs.' Mot., Ex. 20, 298:14-301:13.)

  The Secretary responds that Mr. Lloyd did not assign responsibility for safety and health to Mr. Sanna. (Pl.'s Resp., Ex. D ¶ 10.)

## II.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact finder could return a verdict for the non-moving party, and a factual dispute is "material" if it might affect the outcome of the case under governing law. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A).

## III.    DISCUSSION

Section 11(c)(1) of the OSH Act states:

No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter.

Courts apply the same principles applicable in other retaliation cases to those brought under Section 11(c) of the OSH Act.[4] See, e.g., Reich v. Hoy Shoe Co., 32 F.3d 361, 365 (8th Cir. 1994); Kennard v. Louis Simmer Commc'ns, Inc., 632 F. Supp. 635, 638 (E.D. Pa. 1986). Thus, in the absence of direct evidence, the plaintiff must first make a prima facie case of retaliation by showing (1) participation in a protected activity, (2) a subsequent adverse action by the employer, and (3) evidence of a causal connection between the protected activity and the adverse action. See Reich, 32 F.3d at 365. The burden then shifts to the defendant, who must

---

[4] The parties agree that the burden-shifting framework applied in other retaliation cases should be used in analyzing a retaliation claim brought under the OSH Act.

articulate an appropriate non-discriminatory reason for its action.  Id.  Finally, if the defendant

satisfies its burden, the plaintiff must then demonstrate that the proffered reason is pretextual.  Id.

## A.    Prima Facie Case – Protected Activity & Adverse Action

Defendants do not dispute that the Secretary can establish that Mr. Spillane, in taking and

supplying photographs of the worksite, engaged in protected activity.  Defendants urge, however,

that Mr. Lloyd was unaware of Mr. Spillane's protected activity.

Defendants also do not dispute that the Secretary can establish that Mr. Sanna provided

testimony to OSHA in February 2015 during the inspection, that Mr. Lloyd was aware of this

testimony, and that such conduct constitutes protected activity.[5]  See 29 C.F.R. § 1977.11

("Discharge of, or discrimination against, any employee because the employee 'has testified or is

about to testify' in proceedings under or related to the Act is also prohibited by section 11(c).").

Finally, Defendants do not dispute that both Mr. Spillane and Mr. Sanna suffered an

adverse action—both were terminated.

## B.    Prima Facie Case – Causal Connection

Defendants' primary argument is that the Secretary cannot establish a prima facie case of

retaliation because he cannot demonstrate a causal connection between either Mr. Spillane or Mr.

Sanna's protected activity and their termination.

Courts generally focus on "two main factors in finding the causal link necessary for

retaliation: timing and evidence of ongoing antagonism."  See Abramson v. William Paterson

College of N.J., 260 F.3d 265, 288 (3d Cir. 2001).  "If the timing of the alleged retaliatory action

---

[5] Additionally, it is undisputed that Mr. Sanna is closely related to a third-party who engaged in protected activity—he is Mr. Elbode's grandfather and Mr. Elbode filed a complaint with OSHA. Courts have found termination to be retaliatory where the terminated employee did not himself engage in protected activity, but had a close relationship with the person who did.  See, e.g., Montone v. City of New Jersey, 709 F.3d 181, 197 (3d Cir. 2013); Reich v. Cambridgeport Air Sys., 26 F.3d 1187, 1189 (1st Cir. 1994).

is 'unusually suggestive of retaliatory motive' a causal link will be inferred." See Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997). When a causal connection relies on temporal proximity alone, courts generally require that the termination occur within a few days of the protected activity. See, e.g., Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (holding that a causal link can be inferred where two days passed between the employee's protected activity and the adverse employment action); Whitman v. Proconex, Inc., No. 08-2667, 2009 WL 141847, at *10-12 (E.D. Pa. Jan. 20, 2009) (finding that discharge within minutes of returning from FMLA leave was "unduly suggestive" of a causal link); Reinhart v. Mineral Techs. Inc., No. 05-4203, 2006 WL 4050695, at *10-11 (E.D. Pa. Nov. 27, 2006) (finding evidence that termination occurred within twenty-four hours after returning from FMLA leave sufficient to survive summary judgment).

Also, a court may infer causation where an employer engages in a continuous pattern of antagonism between the time an employee engaged in protected activity and the adverse employment action. Abramson, 260 F.3d at 288. Temporal proximity and evidence of antagonism "are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." See Kachmar v. SunGard Data Sys., 109 F.3d 173, 177 (3d Cir. 1997). Courts consider a "broad array of evidence" on the causation prong. See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 284 (3d Cir. 2000). However, a plaintiff "cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." See Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 196 (3d Cir. 2015).

## i.    Mr. Spillane

Defendants contend that the Secretary has offered no evidence of a causal connection between Mr. Spillane's protected activity and termination.  They argue that the Secretary cannot demonstrate temporal proximity between when Mr. Spillane took photographs (July and August 2014) and when he was terminated (November 2014).  Additionally, Defendants assert there is no other evidence giving rise to an inference of causation, nor is there evidence to suggest that Mr. Lloyd knew or suspected Mr. Spillane was providing the photographs for the OSHA investigation.  Defendants point to the fact that Mr. Lloyd gave Mr. Spillane baseball tickets after learning that he had taken photographs as evidence that Mr. Lloyd did not know the photographs were for the OSHA investigation.  (Defs.' Mot. at 12-18.)

According to the Secretary, missing from Defendants' timeline is November 13, 2014—the day that Compliance Safety and Health Officers arrived at the plant as part of the OSHA investigation.  While the Secretary acknowledges that several months passed between when Mr. Spillane took photographs and when he was terminated, he stresses that Mr. Spillane's firing five days after the arrival of OSHA personnel at Lloyd Industries supports an inference of a causal connection between the protected activity and the adverse action.  (Pl.'s Resp. at 11-12.)

Additionally, the Secretary argues that Mr. Lloyd knew, or at least correctly surmised, that Mr. Spillane's photographs were for the OSHA investigation.  In support, he points to the following facts: Mr. Lloyd knew that Mr. Elbode filed a complaint with OSHA before OSHA came to inspect the plant; Rene Santos saw Mr. Spillane taking photographs of the press brake machine and informed Mr. Lloyd that he saw Mr. Spillane taking photographs at the machine "where a worker got hit"; Mr. Lloyd responded that he had "heard that that was part of the deal that [Mr. Spillane] was taking pictures"; Compliance Safety and Health Officers arrived at the

plant on November 13, 2014 as part of the OSHA investigation; and Mr. Lloyd fired Mr. Spillane on November 18, 2014. (Id. at 12-13.)

Defendants contend that this evidence is insufficient to demonstrate knowledge and cite first to Fagin v. Oxford OB/GYN, No. 10-75, 2011 WL 2551032 (S.D. Ohio June 27, 2011), where the court found that an unsupported allegation of an overheard conversation was insufficient to demonstrate that the employer knew about the protected activity. Defendants also cite to Norman v. Reading Sch. Dist., No. 08-4266, 2010 WL 1348455 (E.D. Pa. Mar. 30, 2010), where summary judgment was granted because the plaintiff failed to put forward any evidence that a decision maker knew about his protected activity and thus could not show a causal connection. Rather, the court observed that the plaintiff merely speculated that people working for the defendant knew about his complaint and discussed it with others. Norman, 2010 WL 1348455, at *17-18.

I disagree with Defendants that it is unsupported or merely speculative that Mr. Lloyd believed that Mr. Spillane was taking photographs for the OSHA investigation. "Certain circumstantial evidence may be adequate to support an inference of discrimination sufficient to meet plaintiff's prima facie burden." Reich, 32 F.3d at 365 (finding a causal connection where the evidence supported an inference that the employer suspected a certain employee had filed an OSHA complaint). "[C]ommon sense and experience establish that employers also make employment decisions on what they suspect or believe to be true." Id.

It is undisputed that Rene Santos advised Mr. Lloyd that Mr. Spillane had taken photographs of the exact machine where Mr. Elbode was injured. It is also undisputed that Mr. Lloyd knew that Mr. Elbode had filed a complaint with OSHA regarding his injury and that machine. Viewing this evidence in the light most favorable to the Secretary, a reasonable fact

finder could believe that Mr. Lloyd concluded the photographs were being supplied for an OSHA investigation.

While I agree with Defendants that there is no evidence of temporal proximity between when Mr. Spillane took photographs and was fired, Mr. Spillane was fired only five days after the compliance officers from OSHA showed up at Lloyd Industries to investigate Mr. Elbode's complaint. Viewing this evidence in the light most favorable to the Secretary, it is entirely possible that Mr. Lloyd fired Mr. Spillane because he provided photographs that Mr. Lloyd suspected contributed to the OSHA investigation.

### ii. Mr. Sanna

Defendants argue that the Secretary cannot show a causal connection between Mr. Sanna's protected activity and termination because six months passed between when Mr. Lloyd knew about Mr. Elbode's complaint (December 2014) and Mr. Sanna's termination (May 2015), and three months passed between Mr. Sanna's OSHA testimony (February 2015) and his termination (May 2015). Defendants further contend that the Secretary has not put forward any other evidence demonstrating that Mr. Sanna's OSHA testimony caused Mr. Lloyd to fire him. (Defs.' Mot. at 21-22.) The Secretary responds that Defendants have omitted a critical fact: Mr. Sanna was fired on May 11, 2015—the same day that Mr. Lloyd received the OSHA citations. Additionally, the Secretary contends these dates must be viewed through a lens considering what else Mr. Lloyd knew: Mr. Sanna is Mr. Elbode's grandfather, and Mr. Elbode had filed a complaint with OSHA. According to the Secretary, these facts, assessed together, lead to the inference that Mr. Lloyd fired Mr. Sanna because of his OSHA testimony. (Pl.'s Resp. at 18-20.)

Considering the evidence in the light most favorable to the Secretary, I find that the Secretary has put forward sufficient evidence to suggest that Mr. Lloyd fired Mr. Sanna because

he provided testimony to OSHA and/or because his grandson had filed a complaint with OSHA. A fact finder could certainly conclude that on the same day he was fined $822,000, Mr. Lloyd illegally fired the grandfather of the employee who filed an OSHA complaint and who provided testimony for the OSHA investigation for retaliatory purposes.

As such, for the purposes of this motion, the Secretary has put forward sufficient evidence that both Mr. Spillane and Mr. Sanna were fired for engaging in protected activity.

## C. Legitimate Non-Discriminatory Reason and Pretext

Defendants assert that even if the Secretary can establish a prima facia case of discrimination, summary judgment is appropriate because they have proffered the following legitimate non-discriminatory reasons ("LNDR") for Mr. Spillane and Mr. Sanna's terminations: (1) Mr. Spillane was a bad employee who slept on the job, and (2) Mr. Sanna was terminated because he neglected his duties as the employee assigned to oversee OSHA compliance. I agree with Defendants that they have met their "relatively light" burden at this stage of articulating legitimate non-discriminatory reasons for the decision to terminate Mr. Spillane and Mr. Sanna's employment. See Dunsmuir v. May Dept. Stores Co., 120 F. App'x 927, 929 (3d Cir. 2005) (affirming denial of summary judgment where employer contended it fired plaintiff for committing various safety violations and plaintiff failed to establish that this reason was pretextual); Jones v. Hosp. of Univ. of Pa., No. 03-4938, 2014 WL 1773725, at *4 (E.D. Pa. 2004) (concluding that defendant proffered an LNDR where it claimed to have fired plaintiff because she slept on the job).

As such, the burden shifts back to the Secretary to demonstrate pretext. Defendants contend that the Secretary has failed to offer any evidence from which a reasonable fact finder

could disbelieve Defendants' articulated non-discriminatory reasons or believe that discrimination was more likely than not a motivating or determinative factor.

   *i.     LNDR 1 – Mr. Spillane slept on the job*

The Secretary urges that a jury could disbelieve Defendants' assertion that Mr. Spillane was terminated because he slept on the job.

First, the Secretary highlights an inconsistency in Mr. Lloyd's testimony and Russell Murphy's testimony. Mr. Lloyd testified that he first heard about Mr. Spillane sleeping in his car from Russell Murphy about three or four months after Mr. Spillane began working at Lloyd Industries. However, Murphy testified that he never spoke with Mr. Lloyd about Mr. Spillane sleeping in his car prior to Mr. Spillane's termination. (Pl.'s Resp. at 14; Id., Ex. F, 79:11-17, 82:10-23; Id., Ex. J, 51:18-52:3.)[6] This factual disparity is reason enough to let a factfinder evaluate Defendants' proffered LNDR.

The Secretary next turns to Mr. Lloyd's explanation regarding the facts and circumstances surrounding Mr. Spillane's firing. The Secretary focuses on Mr. Lloyd's statement that he did not fire Mr. Spillane for sleeping immediately after hearing about it from Russell Murphy because he "like[s] to hear it from two different people. . . . [because] it makes it more credible." The Secretary points out that Mr. Lloyd testified he received a second report of

---

[6] The Secretary points out that Mr. Lloyd testified that one of the reasons he fired Mr. Spillane was because he was a bad employee, but that Defendants have not pressed this as an LNDR in their memorandum. Nonetheless, the Secretary highlights that Mr. Lloyd testified that Mr. Spillane's supervisor, Kai Tran, was the only employee who had complained about Mr. Spillane's work to him. According to Mr. Lloyd, Tran spoke to him once or twice about this. However, Tran testified that he never spoke to Mr. Lloyd about Mr. Spillane being a bad worker. In fact, Tran testified that he never spoke to Mr. Lloyd about Mr. Spillane before Mr. Spillane was fired. (Pl.'s Resp., Ex. F, 27:1-3, 72:14-18; Id., Ex. I, 26:13-24.)

Mr. Spillane sleeping from Rene Santos, yet Mr. Spillane was not fired until two months later.[7] According to the Secretary, this gap in Mr. Lloyd's explanation further reflects that a factfinder should sort out the facts. (Pl.'s Resp. at 14; Id., Ex. F, 73:6-12, 79:18-25, 86:1-18.)

Finally, the Secretary contends there is evidence that Mr. Lloyd fabricated a non-discriminatory reason for firing Mr. Spillane after he had already been fired. Murphy testified that "it became questioned that [Mr. Spillane] was fired wrong, so they had asked for witnesses to him in the parking lot." Murphy further testified that either Mr. Lloyd or Mr. Sanna approached him after Mr. Spillane was fired and asked if he had "seen Mr. Spillane doing this," i.e., sleeping. Mr. Murphy provided a note saying that he had witnessed "former employee Matt Spillane sleeping in his car while clocked in at work." (Pl.'s Resp. at 15-16; Id., Ex. J, 57:3-58:22.)

In addition, the chronology of events could also establish that Mr. Spillane's firing for alleged sleeping on the job was pretextual. Mr. Elbode filed his OSHA complaint in October 2014; Mr. Lloyd was aware of the complaint; Rene Santos saw Mr. Spillane taking pictures of the worksite where Mr. Elbode was injured and informed Mr. Lloyd of such; Compliance and Safety Officers arrived at Lloyd Industries as part of the OSHA investigation on November 13, 2014; and Mr. Spillane was terminated five days later, on November 18, 2014.

Viewing all of this evidence in the light most favorable to the Secretary, I conclude that the Secretary has pointed to sufficient evidence to demonstrate that Defendants' non-discriminatory reason for firing Mr. Spillane was pretextual. Defendants contend that the facts the Secretary points to amount to only "minor inconsistencies." I disagree. A fact finder could determine that Russell Murphy's testimony calls into question Mr. Lloyd's credibility.

---

[7] The Secretary also cites to conflicting testimony as to where Mr. Lloyd and Rene Santos had this conversation. According to Santos, it occurred while he was just "walking around," but according to Mr. Lloyd it occurred in his office.

Moreover, a fact finder could find the fact that Mr. Spillane was fired five days after the OSHA officers arrived at Lloyd Industries as evidence of retaliation for providing photographs for the OSHA investigation. See Farrell, 206 F.3d at 286 ("[E]vidence supporting [a] prima facie [retaliation] case is often helpful in the pretext stage and nothing about the McDonnell Douglas [burden-shifting] formula requires us to ration the evidence between one stage or the other.").

    ii.      *LNDR 2 – Mr. Sanna neglected duties as the employee assigned to oversee OSHA compliance*

The Secretary asserts that a jury could disbelieve the reason Defendants identify for firing Mr. Sanna because there are several questions about the credibility of Mr. Lloyd's proffered reason for firing Mr. Sanna.

First, the Secretary avers there is evidence undermining Mr. Lloyd's statement that he believed Mr. Sanna was responsible for safety and health at the plant. The Secretary contends that had Mr. Lloyd truly believed that Mr. Sanna was responsible for safety and health, he would have included Mr. Sanna in the OSHA inspection. Instead, Mr. Sanna stated that Mr. Lloyd did not ask him to participate in the initial meeting with the OSHA agents on November 13, 2014, nor was he included in any part of the OSHA inspection at any time in 2014. According to the Secretary, this evidence undermines Defendants' position that Mr. Lloyd believed Mr. Sanna was in charge of safety and health, and thus calls into question whether Mr. Lloyd in fact fired Mr. Sanna for failing to uphold his duties to oversee OSHA compliance. (Pl.'s Resp. at 18-19; Id., Ex. C, 1765:11-25.)

Second, the Secretary asserts that Mr. Lloyd had already considered firing Mr. Sanna in December 2014 during the OSHA inspection, citing to Mr. Lloyd's testimony that he posted a job listing for a plant manager on Monster.com. Mr. Lloyd testified that he was not planning to replace Mr. Sanna at that time, but instead had decided to hire a second plant manager to oversee

"administrative stuff." Yet, Mr. Lloyd never hired anyone to fill that second position. Rather, he interviewed one person, did not hire them, and never posted a listing for that position again. According to the Secretary, this evidence suggests Mr. Lloyd had considered firing Mr. Sanna for reasons other than the OSHA violations, and had in fact actively looked for a replacement, before the OSHA citations were issued. (Pl.'s Resp. at 19; Id., Ex. F, 165:5-166:17; Id., Ex. D ¶ 11.)

Finally, the Secretary highlights an inconsistency between Mr. Lloyd's claim that he fired Mr. Sanna due to OSHA safety and health hazards and Mr. Lloyd's belief that there were no safety and health hazards at his plant. Mr. Lloyd testified that he believed the OSHA citations were "frivolous" and that there was "no merit whatsoever" to them. The Secretary contends that if Mr. Lloyd believed the citations were meritless and "frivolous," it is illogical that he would fire his plant manager of six years. Prior to the OSHA citations, Mr. Sanna had earned two raises and Mr. Lloyd testified that Mr. Sanna had never performed any of his job duties in less than a satisfactory manner. (Pl.'s Resp. at 19-20; Id., Ex. E, 88:4-20; Id., Ex. F, 127:3-17; 132:4-15.)

In addition to the facts above, Mr. Sanna's grandson filed a complaint with OSHA in October 2014; Mr. Sanna testified before OSHA in February 2015; OSHA issued citations to Defendants amounting to $822,000 on May 11, 2015; and Mr. Sanna was fired on May 11, 2015.

Viewing this evidence in the light most favorable to the Secretary, I conclude that he has pointed to sufficient evidence to demonstrate that Defendants' non-discriminatory reason for firing Mr. Sanna was pretextual. In concluding such, I have also considered the evidence Mr. Sanna offered in support of his prima facie case. A fact finder could find the fact that Mr. Sanna

was fired on the same day that OSHA citations were lodged to be evidence that Mr. Lloyd fired

him in retaliation for testifying before OSHA and being related to Mr. Elbode.

In sum, the evidence presented by the Secretary provides a sufficient basis on which a

jury could infer that the two non-discriminatory reasons proffered by Defendants were pretextual

for retaliation.[8]  See Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1071 (3d Cir.

1996) (observing that the determination of whether the reason given was pretextual should

generally be left for the jury).  Based on the foregoing, the Secretary has established both a prima

facie case of retaliation in violation of the OSH Act and the existence of genuine issues of

material fact regarding whether Defendants' proffered reasons for Mr. Spillane and Mr. Sanna's

termination were pretextual.  Defendants' motion for summary judgment on the Secretary's OSH

Act retaliation claim will be denied.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment will be denied.

An appropriate Order follows.

---

[8] Defendants also contend that, in order to demonstrate pretext, the Secretary must identify comparator employees who had the same or similar performance problems about which Defendants were aware, but had not engaged in any protected activity and thus were not terminated.  (Defs.' Mot. at 19, 24-25.)  The Secretary does not address this argument in his response.

Defendants cite to Young v. City of Phila. Police Dep't., 651 F. App'x 90 (3d Cir. 2916), where the United States Court of Appeals for the Third Circuit found that the plaintiff failed to demonstrate pretext where she did not put forward evidence of a person who did not engage in protected activity being treated differently.  The Young court cited to Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644-45 (3d Cir. 1998).  Importantly, the Simpson court did not require a showing of a comparator, but instead stated that evidence of a comparator was one way that a plaintiff could show pretext.  142 F.3d at 644-45 (listing multiple ways a plaintiff can show pretext).  Thus, because I find that the Secretary has put forward sufficient evidence from which a jury could infer pretext, it is not fatal that he has failed to identify comparators.