## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THOMAS E. PEREZ,** | : | **CIVIL ACTION** |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | **No. 16-cv-1079** |
| | : | |
| **LLOYD INDUSTRIES, INC., <u>ET</u> <u>AL.</u>,** | : | |
| | : | |
| *Defendants.* | : | |

**Goldberg, J.**                                                                                          **August 8, 2019**

## <u>MEMORANDUM OPINION</u>

Following a five-day trial, a jury determined that Defendants, Lloyd Industries, Inc. ("Lloyd Industries") and Mr. William Lloyd, wrongfully terminated two employees, Mr. Matthew Spillane and Mr. Santos Sanna, due to their involvement in assisting the Occupational Safety and Health Administration ("OSHA") in an investigation into safety hazards at Lloyd Industries. The jury found that these terminations were retaliatorily, in violation of § 11(c) of the Occupational Safety and Health ("OSH") Act, 29 U.S.C. § 660.

On May 29, 2019, I presided over a bench trial on the issue of damages pursuant to 29 U.S.C. § 660(c)(2). Based on the evidence presented at that trial and my review of the evidence presented to the jury, I find that Mr. Spillane is entitled back pay in the amount of $117,710. I further find that Mr. Sanna is entitled to back pay in the amount of $373,568, and front pay in the amount of $56,121. Finally, Defendants shall pay punitive damages of $100,000 to Mr. Spillane and $400,000 to Mr. Sanna.

# I.    FINDINGS OF FACT

## A.    Pertinent Procedural Background

1. Prior to trial, I considered several motions *in limine* and determined that, pursuant to 29 U.S.C. § 660(c)(2), the trial would be bifurcated into two phases: (a) the liability phase decided by a jury, and (b) the damages phase decided the Court. (Order, Mar. 29, 2019, ECF No. 69.)

2. The liability phase of the trial began on March 27, 2019, lasting five days and concluding on April 2, 2019.

3. During the trial, the following timeline was established: Mr. Sanna began working for Defendants on July 28, 2008. (Am. Trial Tr., 201:6–15, Mar. 28, 2019, ECF No. 96.) Mr. Spillane began working for Defendants on May 7, 2014. (Id. 117:9–12.) Mr. Joshua Elbode, who is not a party to this lawsuit, sustained an injury while working for Defendants in July of 2014. (Id. 91:6–16.) In October of 2014, Mr. Elbode filed a complaint with OSHA. (Am. Trial Tr. vol. 2, 77:25–78:18, Mar. 27, 2019, ECF No. 95.) OSHA inspected Defendants' plant on November 13, 2014. (Am. Trial Tr., 105:20–24, Mar. 28, 2019, ECF No. 96.) Mr. Spillane was terminated on November 18, 2014. (Id. 105:15–19.) Mr. Sanna provided testimony to OSHA in February of 2015. (Am. Trial Tr., 42:20–43:15, Mar. 29, 2019, ECF No. 97.) OSHA issued citations against Defendants in the amount of $822,000 on May 11, 2015. (Id. 103:13–16.) Mr. Sanna was terminated on that same day. (Id. 103:19–25.)

4. On April 2, 2019, the jury returned a verdict as to Mr. Spillane, finding that "the Secretary[1] prove[d] by a preponderance of the evidence that Defendants, Lloyd Industries Inc. ("Lloyd Industries") and Mr. William Lloyd, terminated Mr. Spillane in November 2014 because he engaged in a 'protected activity.'" (Verdict Sheet, Apr. 2, 2019, ECF No. 75.) The jury also returned a verdict as to Mr. Sanna, finding that "the Secretary prove[d] by a preponderance of the evidence that Mr. Sanna's engagement in a 'protected activity' was a substantial reason for his termination in May 2015." (Id.)

5. On May 29, 2019, I presided over a bench trial on the remaining issue of damages. I summarize the evidence presented below.

**B.     Evidence Relating to Mr. Spillane**

6. I find that the following facts have been credibly established as they relate to Mr. Spillane.

7. Matthew Spillane was born on January 21, 1985 and is thirty-four years old. (Am. Trial Tr., 6:7–12, May 30, 2019, ECF No. 105.) Mr. Spillane is married with four children and has a General Education Diploma. (Id. 6:13–7:3.)

8. At the time he was fired, Mr. Spillane was earning $12.45 per hour. (Id. 9:12–18.) Mr. Spillane earned a total of $18,635 during his employment with Defendants and his annualized earnings were $35,123. (Id. 9:15–10:1.) Spillane was able to work almost every weekend and earn overtime, which helped him support his family. (Id. 12:16–13:3.)

---

[1]     When this action was filed, the Secretary of the Department of Labor was R. Alexander Acosta. The current Secretary is Thomas Perez.

9. Mr. Spillane was happy with his job at Lloyd Industries because he liked the people he worked with, the clear work duties, and the variety of tasks.  (<u>Id.</u> 10:4–17.)  He was not "actively looking for other jobs" while working for Defendants.  (<u>Id.</u> 13:4–6.)  Mr. Spillane turned down a job offer to earn more money while he was working for Defendants because he was content working at Lloyd Industries.  (<u>Id.</u> 13:7–14:7.)

10. Mr. Spillane had filled out the paperwork for health insurance benefits offered through Defendants right before he was terminated as he had to work for six months before he was eligible for such benefits.  (<u>Id.</u> 10:18–11:23.)

11. Initially, Mr. Spillane lived forty-five minutes away from Defendants' plant, but he decided to move closer to the plant (<u>i.e.</u>, eight or nine minutes away) while he was still employed.  (<u>Id.</u> 11:24–12:15.)

12. Mr. Spillane's termination resulted in the loss of his house, his reliance on his savings and selling of personal property, and the need to move in with his mother-in-law.  (<u>Id.</u> 15:6–17.)

13. Mr. Spillane asked Mr. Lloyd for his job back in late November of 2014, which Mr. Lloyd denied.  Mr. Spillane would have taken his job back at any time as long as he was treated fairly.  (<u>Id.</u> 14:8–24.)

14. Mr. Spillane's job-search efforts in 2015 after his termination included creating profiles on job-search websites (<u>i.e.</u>, Indeed, Career Builders, and Monster.com) and applying for 75–100 jobs through email messages, job-search websites, and staffing agencies, including Aerotek, McCallion, and EverStaff.  (<u>Id.</u> 21:7–22:22.)  His search criteria included (a) production, warehousing, and restoration jobs; (b) within a one-hour radius; and (c) a minimum salary of $10 per hour.  (<u>Id.</u> 23:19–24:8.)  His

efforts in 2015 yielded a job offer with a restoration company that he had previously worked for in Philadelphia. (Id. 13:11–12.) However, he declined the offer because it would have required him to relocate to Brooklyn, New York, which was financially unfeasible for his family. (Id. 59:17–61:12.) He also interviewed with two staffing agencies, McCallion and Aerotek, but received no job offers due to his criminal background. (Id. 22:23–23:18.) He received no other job offers or interviews from these efforts. (Id. 22:13–14.)

15. On January 10, 2016, Mr. Spillane began working a full-time job with Servpro, a restoration company. (Id. 24:19–27:1.) He began working as a laborer, earning $13 per hour and was promoted to crew chief within seven weeks of employment, earning $14 per hour. (Id.) Mr. Spillane worked an average of 65–70 hours per week, working as many as 100 hours per week on occasion. (Id.) On August 28, 2016, Mr. Spillane was injured while working for Servpro. (Id. 27:2–30:7.) Mr. Spillane worked consistently despite this injury, except for a short period in March of 2017, due to medically-necessary surgery and the corresponding recovery. (Id. 29:14–30:7.)

16. Mr. Spillane worked for Servpro until he was terminated on July 11, 2017, resulting from a verbal altercation with the office manager. (Id. 30:11–12, 64:6–68:7.) Mr. Spillane explained the circumstances surrounding the termination: he testified that his office manager approached him angrily first thing on the morning of July 11, 2017 because four other people had called out of work and there was a "big job" opportunity that required staffing. (Am. Trial Tr., 30:24–31:9, 67:8–68:7, May 30, 2019, ECF No. 105.) When he was asked to take this job, Mr. Spillane told his

office manager that he could not take it without having someone with experience assist him.  (Id.)  After Mr. Spillane was terminated, Servpro disputed the award of unemployment compensation benefits.  Despite Servpro's objections, the referee awarded the benefits to Mr. Spillane, finding that his termination was not caused by his malfeasance.  (Id. 30:10–17.)  Mr. Spillane earned $43,930 in 2016 and $22,668 in 2017 from his employment with Servpro.  (Id. 30:16–21.)

17. Upon his termination in July of 2017, Mr. Spillane undertook job-search efforts similar to those taken in 2015, which included applying for jobs on Craigslist and Facebook Marketplace.  (Id. 32:1–13.)  He estimates that he applied to about fifty jobs between July and December of 2015.  (Id. 32:9–11.)

18. Between January and February of 2018, Mr. Spillane agreed to complete construction work for his friend, which lasted four-to-five weeks.  However, he was never paid for this work, and the work eventually slowed down.  (Id. 32:14–33:17, 69:19–70:4.)

19. Subsequently, Mr. Spillane worked as an Uber driver for approximately two months, until he was prohibited to work due to his criminal background.  (Id. 33:18–34:12.) He made approximately $3,500 as an Uber driver.  (Id. 33:22–24.)

20. Mr. Spillane continued his job-search efforts throughout 2018 using Craigslist.  He applied for jobs with Timberlane, Mancino Manufacturing Company, and Amazon. (Id. 34:13–39:7.)

21. Mr. Spillane did not turn down any job that he was offered after Defendants' terminated him and has been "ready and willing" to accept employment.  (Id. 39:8– 14.)

22. Mr. Spillane explained that he has a chronic eye condition that existed before he began employment with Defendants (i.e., since 2007), and that this condition has not prevented him from performing any job at any time. On January 22, 2019, Mr. Spillane elected to have a surgery given the lack of employment opportunities. This surgery has resulted in him being unable to work until January of 2020. Mr. Spillane clarified that he would not have elected to have this surgery if he had been employed. (Id. 40:5–41:10; 73:1–23.)

23. Between 2002 and 2014, Mr. Spillane held eight different jobs before he began his employment with Defendants. (Id. 56:7–59:9.)

**C.**     **Evidence Relating to Mr. Sanna**

24. I find that the following facts have been credibly established as it relates to Mr. Sanna.

25. Mr. Sanna is sixty-nine years old and has a high school diploma. (Am. Trial Tr. vol. 1, 17:15–17, 18:10–15, May 29, 2019, ECF No. 103.)

26. Mr. Sanna enjoyed working for Defendants because he "got along with everybody in the shop," enjoyed the work, and had good hours. (Id. 22:14–23:11.) He lived two miles from the plant, which was about a seven-minute drive. (Id. 24:2–8.)

27. Mr. Sanna earned $70,000 plus benefits while employed for Defendants. (Id. 18:25–27.) Mr. Sanna had full health insurance for himself and his wife through Defendants, which covered prescriptions. Defendants also provided him with a gas card. (Id. 23:12–28.)

28. Mr. Sanna had no intention of leaving his employment with Defendants and would have continued working until he was seventy-four years old. (Id. 24:9–23.) Mr.

Sanna indicated that he would have taken his job back from Defendants as long as he would have been treated fairly.  (Id. 47:20–23.)

29. Mr. Sanna described the financial impact of his termination, including that he had to use a $50,000 line-of-credit secured by his home, of which he has spent $46,000 to date. (Am. Trial Tr. vol. 2, 17:12–18:11, 19:19–21:18, ECF No. 104.) Additionally, Mr. Sanna has a recurring monthly expense of $400 for private health insurance costs.  (Id.)  He received unemployment benefits for twenty-three weeks and applied for social security benefits once he became eligible in November of 2015.  (Id. 20:23–22:12.)

30. Mr. Sanna's job-search efforts throughout 2016 and 2017 included posting a resume online and keeping detailed records of his employment-seeking efforts.  (Id. 23:13–39:11.)  While many of the jobs that he applied for were within ten miles of his home, Mr. Sanna did not limit his search based on this geographical radius, and applied for jobs as far away as Allentown, Pennsylvania.  (Id. 31:14–21.)  Mr. Sanna was offered one job opportunity in Allentown in eldercare, but he declined that position because it was not his area of expertise.  (Id. 27:12–14, 31:20–33:13.)  Mr. Sanna's efforts did not yield any other job opportunities.  (Id. 23:13–39:11)

31. In 2017, Mr. Sanna expanded his job-search efforts to include driving for limousine companies.  (Id. 37:16–39:3.)  Sometime in March or April of 2017, he secured employment as a driver for King Limousine.  (Id. 39:7–40:1.)  Shortly thereafter, Mr. Sanna left his job with King Limousine because of the inconsistent and long hours and damage to his car.  (Id. 40:2–43:4.)  During his employment with King Limousine, he earned $1,073.  (Id. 43:5–7.)

32. Mr. Sanna's job-searching efforts continued in 2017 and 2018, whereby he continued to seek employment through online efforts and followed up with several sheet metal fabrication companies. (Id. 44:23–47:8.)

## C.    Other Evidence

33. In an effort to preclude or limit Mr. Sanna's damages, Defendants introduced "after-acquired" evidence relating to Mr. Sanna's alleged sexual harassment of another employee, Ms. Katie Gans.  Ms. Gans worked at Lloyd Industries in the administrative office beginning in 2007 or 2008. (Id. 71:12–24.) Ms. Gans testified that she left Lloyd Industries in 2012 partially because of Mr. Sanna's sexual harassment. (Id. 72:7–18.)  Ms. Gans explained that Mr. Sanna asked her out to dinner, made comments about her breasts and body, and contacted her outside of work via Facebook Messenger. (Id. 73:3–80:10.)   Ms. Gans told her father, Mr. Bobby Gans, about the alleged harassment only after Mr. Sanna had been terminated. (Id. 52:7–15, 74:21–80:10, 86:2–88:10.)  She explained that the only person she told about this conduct was her friend, Mr. Russel Murphy, who was a manager at Lloyd Industries. (Id.)  Defendants introduced the Facebook messages as evidence.[2]   (Id. 73:3–80:10.)   When asked about these messages during cross-examination, Ms. Gans stated that, while she thought that the Facebook messages were flirtatious, she did not think that they were harassment. (Id. 93:24–95:10.)  On

---

[2]    Defendants introduced several of these messages sent from Mr. Sanna to Ms. Gans.  One such message was sent in response to Ms. Gans's notification that she would be in late due to a doctor's appointment: "Yes, it is okay.  Please do come 7:30 [sic.] if possible.  Also, did I ever tell you I am a doctor?  LOL.  See you Monday, Katie.  You the best." (Am. Trial Tr. vol. 2, 83:25–84:5, ECF No. 104.)  Another message stated: "I don't want to say a lot on your timeline." (Id. 83:7–9.)  The final message that Mr. Sanna sent to Ms. Gans read: "I wish you a very happy birthday.  You know you are special.  I wish I could have a special dinner with you." (Id. 84:19–25.)

cross-examination, she also acknowledged that Mr. Sanna never intentionally touched her.  (Id. 95:6–97:4.)

34. Credible testimony was also introduced that, during the time frame of the alleged harassment, Mr. Lloyd made inappropriate comments about women in the workplace, there were pictures of naked women throughout the plant, and Mr. Lloyd kept pornographic magazines in his bathroom at work.  (Id. 97:5–98:16, 135:2–140:24.)  Mr. Lloyd also acknowledged that, upon hearing Ms. Gans's allegations relating to Mr. Sanna, no investigation was conducted.  (Trial Tr., 174:1–24, May 30, 2019, ECF No. 105.)

35. Regarding Mr. Lloyd's knowledge of the OSH Act's prohibition against retaliation, the Secretary introduced the testimony of Ms. Jean Kulp, who is the area director for OSHA, regarding her previous interactions and inspections with Defendants in order to establish Defendants' knowledge of the OSHA prohibitions and regulations. Ms. Kulp provided extensive and uncontradicted evidence that Mr. Lloyd knew that he was prohibited from discriminating against employees who exercise their rights under the OSH Act.  (Trial Tr. vol. 2, 115:1–118:20, May 29, 2019, ECF No. 104.)

36. The Secretary also presented Mr. Chad Staller as an expert in economic loss models in support of the requested damage amounts.  (Trial Tr., 75:7–80:22, May 30, 2019, ECF No. 105.)  Defendants neither objected to Mr. Staller's qualifications to offer an opinion on lost wages, nor did they seriously challenge his calculation methodology on cross-examination.  (Id. 75:16–76:2.)  Mr. Staller computed back pay for Mr. Spillane and Mr. Sanna, as well as front-pay for Mr. Sanna.  As

Defendants did not provide any expert testimony to the contrary, these calculations were essentially unchallenged.

37. Mr. Staller also opined that Mr. Sanna was entitled to back pay of $281,691, plus interest and front pay of $56,121, for a total of $337,812. (Id. 86:1–95:10.) He explained that he calculated Mr. Sanna's damages period from his termination date. (Id. 92:12–19.) Mr. Staller calculated Mr. Sanna's total economic loss during this period using his earnings ($70,000 per year) plus inflation, multiplied by his "statistical work life" of 70 years. (Id. 86:12–87:23.) Mr. Staller explained that a statistical work life is determined using the data published in the Journal of Forensic Economics, which is the primary resource in his field of expertise. (Id. 90:17–91:21.) He then deducted Mr. Sanna's earnings. (Id. 86:24–87:8.) Mr. Staller also explained that he calculated front pay from the date of the trial until November 1, 2019, when he will reach the end of his "statistical work life" (i.e., 70 years old). (Id. 89:14–89:12.)

38. Mr. Staller opined that Mr. Spillane was entitled to back pay of $92,562, plus interest. (Id. 80:23–105:4, 100:3–102:18.) Mr. Staller testified that he calculated Mr. Spillane's damages period from his termination date of November 19, 2015 to December 31, 2018, when Mr. Spillane had cornea issues preventing him from working. (Id. 98:9–21.) Mr. Staller explained that he used the same mythology to calculate the back pay for Mr. Spillane as he used for Mr. Sanna. (Id. 100:3–105:4.)

## II. LEGAL STANDARDS

### A. Damages Available under the OSH Act

Section 11(c) provides for the recovery of compensatory and exemplary damages. <u>Perez v. Clearwater Paper Corp.</u>, 184 F. Supp. 3d 831, 843 (D. Idaho 2016). Under the OSH Act, a district court has jurisdiction to "order all appropriate relief including rehiring or reinstatement of the employee to his former position with back pay." 29 U.S.C. § 660(c)(2). "'[A]ll appropriate relief' includes the full range of civil remedies traditionally available to courts, including compensatory and exemplary or punitive damages." <u>Perez</u>, 184 F. Supp. 3d at 843 (citing <u>Perez v. U.S. Postal Service</u>, 76 F. Supp. 3d 1168, 1193 (W.D. Wash. 2015)).

### B. Prejudgment Interest

The determination of whether to award prejudgment interest lies within "the sound discretion of the district court." <u>Booker v. Taylor Milk Co.</u>, 64 F.3d 860, 868 (3d Cir. 1995). The purpose of prejudgment interest is "to reimburse the claimant for the loss of the use of its investment or its funds from the time of the loss until judgment is entered." <u>Berndt v. Kaiser Aluminum & Chem. Sales, Inc.</u>, 789 F.2d 253, 259 (3d Cir. 1986).

While there is little guidance as to what interest rate should apply in the OSH Act context, courts in this Circuit have applied the rates prescribed in 26 U.S.C. § 6621 to calculate prejudgment interest on back pay awarded under Title VII. <u>See</u> <u>Frazier v. Se. Pa. Transp. Auth.</u>, 814 F. Supp. 11, 12–13 (E.D. Pa. 1993) ("[A]ppropriate rate for prejudgment interest on the award of back pay in this Title VII case is the fluctuating rate pursuant to 26 U.S.C. § 6621."); <u>Taylor v. Cent. Pa. Drug & Alcohol Servs. Corp.</u>, 890 F. Supp. 360, 369 (M.D. Pa. 1995) (calculating prejudgment interest on Title VII back pay award using the overpayment rates in 26 U.S.C. § 6621(a)(1)); <u>Taxman v. Bd. of Educ. of Twp. of Piscataway</u>, 91 F.3d 1547, 1566 (3d Cir. 1996) (concluding

that the trial court did not abuse its discretion in using the rates set in 26 U.S.C. § 6621 to calculate prejudgment interest under Title VII).

Accordingly, I agree with the Secretary that the rates set forth in 26 U.S.C. § 6621(a)(1) should apply to the damages awarded in this case as Title VII and the OSH Act share similar remedial purposes. In both contexts, prejudgment interest is an element of making whole persons who have suffered past discrimination.

### C.    Tax Gross Up

The Third Circuit has held that a district court may "award a prevailing employee an additional sum of money to compensate for the increased tax burden a back pay award may create," which "is driven by the 'make whole' remedial purpose of the antidiscrimination statutes." Eshelman v. Agere Sys., Inc., 554 F.3d 426, 442 (3d Cir. 2009). This additional sum of money is known as a "gross up," and such determination lies within "the sound discretion of the district court." Eshelman v. Agere Sys., Inc., 554 F.3d 426, 440–43 (3d Cir. 2009). A tax gross up takes into account the taxable income that will be owed upon receipt of the back pay award. Comm'r v. Schleier, 515 U.S. 323, 327–30 (1995).

## III.    LEGAL DISCUSSION

The Secretary has moved for the following damage awards: (a) $117,710 in back pay to Mr. Spillane, (b) $373,568 in back pay to Mr. Sanna, (c) $56,121 in front pay to Mr. Sanna, and (d) a significant punitive damages award. (Sec'y Br. 16–17, 25–29, ECF No. 106.) Defendants respond that punitive damages are not available under the OSH Act, Mr. Sanna's recovery is limited by the after-acquired evidence and his failure to mitigate damages, and Mr. Spillane's recovery should end upon his acquisition of the Servpro job. (Defs.' Br. 17–26, ECF No. 107.)

I will address each argument in turn below.

### A.  **Defendants' Affirmative Defenses**

Before detailing the amounts of the damage awards, I will address the two affirmative defenses raised by Defendants, which they argue preclude and/or limit recovery.

### (1)  **Mitigation of Damages**

Defendants first argue that the Secretary did not establish that Mr. Spillane or Mr. Sanna mitigated their damages by seeking other employment.  (Defs.' Br. 23–25, ECF No. 107.)  The Secretary responds that the evidence reflects the ongoing efforts by both Mr. Sanna and Mr. Spillane to seek employment and emphasizes that Defendants have the burden to prove this affirmative defense.  (Sec'y Br. 20–22, ECF No. 106.)

Unlike Title VII, the OSH Act "does not incorporate a statutory duty to mitigate damages." Donovan v. Commercial Sewing, Inc., 562 F. Supp. 548, 554 (D. Conn. 1982).  Thus, "a stronger presumption in favor of comprehensive back pay remedies should govern under OSHA."  Id. However, mitigation of damages is an affirmative defense that may be raised and proven by a defendant.  Anastasio v. Schering Corp., 838 F.2d 701, 707–08 (3d Cir. 1988).  "To meet its burden, an employer must demonstrate that 1) substantially equivalent work was available, and 2) the [plaintiff] did not exercise reasonable diligence to obtain the employment."  Booker v. Taylor Milk Co., 64 F.3d 860, 864 (3d Cir. 1995).

I agree with the Secretary that Defendants have not demonstrated that substantially equivalent work was available because Defendants did not present any evidence on this point.  I also find, based on the substantial evidence before me, that both Mr. Sanna and Mr. Spillane exercised reasonable diligence in obtaining employment.  (See supra ¶¶ 14–20, 30–32.) Accordingly, Defendants have failed to substantiate this affirmative defense.

### (2)    **After-Acquired Evidence**

Second, Defendants argue that Mr. Sanna's award should be limited because they established that Mr. Lloyd would have fired Mr. Sanna based on the "after-acquired evidence" of harassment. (Defs.' Br. 20–23, ECF No. 107.) The Secretary responds that Defendants have the burden to prove this affirmative defense, which they have failed to do in light of the evidence presented. (Sec'y Br. 22–24, ECF No. 106.)

After-acquired evidence of an employee's misconduct is admissible to limit the employee's recovery in a wrongful termination lawsuit. McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 362–63 (1995) ("Our inquiry is not at an end, however, for even though the employer has violated the Act, we must consider how the after-acquired evidence of the employee's wrongdoing bears on the specific remedy to be ordered."). An employer may rely on after-acquired evidence of wrongdoing where it can establish "that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." Id.

If an employer can show that it would have discharged the employee based on "after-discovered evidence, reinstatement is an inappropriate remedy." 1621 Route 22 W. Operating Co., LLC v. Nat'l Labor Relations Bd., 825 F.3d 128, 149 (3d Cir. 2016) (citing McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 360 (1995)). "[A]bsent extraordinary circumstances, backpay runs only until the date that the employer discovered the conduct for which it would have fired the employee." Mardell v. Harleysville Life Ins. Co., 65 F.3d 1072, 1073 (3d Cir. 1995). "The Supreme Court predicted, however, that such after-acquired evidence would generally bar an award of front pay or restitution." McKenna v. City of Phila., 636 F. Supp. 2d 446, 460 (E.D. Pa. 2009).

I agree with the Secretary that Defendants have failed to prove this affirmative defense. While Ms. Gans testified that she was harassed, I decline to find that Mr. Lloyd would have fired Mr. Sanna based on these allegations for the following reasons. First, Mr. Lloyd did not conduct any type of investigation upon hearing of these allegations. As noted above, in order to establish this affirmative defense, the Defendants would have to prove that the harassment was so severe that Mr. Sanna would have been fired on these grounds alone. But, Mr. Lloyd's inaction and complete lack of follow-up upon learning of the alleged harassment belies his contention that he would have fired Mr. Sanna for this alleged conduct. Second, credible evidence established that the culture of the plant under Mr. Lloyd's watch reflected an ongoing tolerance for inappropriate and sexist comments and behavior such that it is improbable that Mr. Lloyd would have fired Mr. Sanna. And third, one of Mr. Lloyd's managers, Mr. Murphy, knew about this alleged harassment prior to Mr. Sanna's termination and did nothing by way of investigation or reporting. (See supra ¶¶ 33–34.) Under all of these circumstances, I find that Defendants have failed to establish this affirmative defense by a preponderance of the evidence.

### B.    Back Pay Damages

The Secretary has moved for (a) $117,710 in back pay to Mr. Spillane and (b) $373,568 in back pay to Mr. Sanna, inclusive of pre-judgment interest and tax gross up. (Sec'y Br. 16–17, ECF No. 106.) In addition to the affirmative defenses raised above, Defendants respond that Mr. Spillane's recovery ends upon his acquisition of the Servpro job. (Defs.' Br. 17–26, ECF No. 107.)

Based on the clear enumeration of the OSH Act, back pay is available as a remedy in this case. 29 U.S.C. § 660(c)(2) ("[T]he United States district courts shall have jurisdiction, for cause shown to restrain violations of paragraph (1) of this subsection and order all appropriate relief

including rehiring or reinstatement of the employee to his former position with back pay."). "Back pay is designed to make victims of unlawful discrimination whole by restoring them to the position they would have been in absent the discrimination." Donlin v. Philips Lighting N. Am. Corp., 581 F.3d 73, 84 (3d Cir. 2009). Back pay may be awarded at the district court's equitable discretion. Id. "The standard calculation for back pay is therefore 'to take the difference between the actual wages earned and the wages the individual would have earned in the position that, but for discrimination, the individual would have attained.'" McKenna v. City of Philadelphia, 636 F. Supp. 2d 446, 456 (E.D. Pa. 2009) (quoting Gunby v. Pa. Elec. Co., 840 F.2d 1108, 1119–20 (3d Cir. 1988)). Unemployment and social security benefits are not deducted from a back pay award. Maxfield v. Sinclair Int'l, 766 F.2d 788, 791 (3d Cir. 1985); Craig v. Y & Y Snacks, Inc., 721 F.2d 77, 81–82 (3d Cir. 1983).

Termination from subsequent employment tolls when the claimant fails to "act reasonably and responsibly in accordance with employer rules." Brady v. Thurston Motor Lines, Inc., 753 F.2d 1269, 1277 (4th Cir. 1985). "[A] a voluntary quit does not toll the period when it is prompted by unreasonable working conditions or the earnest search for better paying employment." Id. "Involuntary terminations from subsequent employment will toll back pay where the reasons for the termination are unrebutted and justified on the record." Richardson v. Tricom Pictures & Prods., Inc., 334 F. Supp. 2d 1303, 1314 (S.D. Fla. 2004), aff'd, 183 F. App'x 872 (11th Cir. 2006).

Here, Mr. Spillane was terminated from his subsequent job at Servpro due to a verbal altercation with the officer manager. (See supra ¶¶ 16–17.) However, I find that the reasons for the termination were adequately explained by Mr. Spillane. His office manager had approached him angrily first thing that morning because four other people had called out of work. (See supra ¶ 16.) Mr. Spillane explained that he responded to the office manager that he could not undertake

such a big job without having someone with experience assist him. (Id.) Despite Servpro's dispute of Mr. Spillane's unemployment compensation benefits, the referee awarded the benefits to Mr. Spillane, finding that the termination was not his fault. (Id.) Unlike the plaintiff in Richardson who was terminated "for cause based on repeated behavior that was not accidental, and was, according to the [other employer's] representative, egregious," Defendants have not provided any evidence to justify limiting Mr. Spillane's back pay due to his termination by Servpro. See Richardson, 334 F. Supp. 2d at 1314. Accordingly, I find that Mr. Spillane is entitled to back pay as calculated by the Secretary's expert.

Given the lack of contrary opinions, and finding the Secretary's expert credible, I will adopt Mr. Staller's calculations and find that (a) Mr. Spillane is entitled to $117,710 in back pay, inclusive of pre-judgment interest and tax gross up, and (b) Mr. Sanna is entitled to $373,568 in back pay, inclusive of pre-judgment interest and tax gross up.

### C. Front Pay Damages

The Secretary has moved for $56,121 in front pay to Mr. Sanna. (Sec'y Br. 25–29, ECF No. 106.) Defendants respond that Mr. Sanna's recovery is limited by the after-acquired evidence and his failure to mitigate damages. (Defs.' Br. 17–26, ECF No. 107.)

Based on the clear enumeration of the OSH Act, reinstatement or front pay is available as a remedy in this case. 29 U.S.C. § 660(c)(2) ("[T]he United States district courts shall have jurisdiction, for cause shown to restrain violations of paragraph (1) of this subsection and order all appropriate relief including rehiring or reinstatement of the employee to his former position with back pay."). "Though back pay makes a plaintiff whole from the time of discrimination until trial, a plaintiff's injury may continue thereafter. Accordingly, courts may award front pay where a victim of employment discrimination will experience a loss of future earnings because she cannot

be placed in the position she was unlawfully denied." Donlin v. Philips Lighting N. Am. Corp., 581 F.3d 73, 86 (3d Cir. 2009). "Front pay is an alternative to the traditional equitable remedy of reinstatement, which would be inappropriate where there is a likelihood of continuing disharmony between the parties." Id. "Because a claimant's work and life expectancy are pertinent factors in calculating front pay, such an award 'necessarily implicates a prediction about the future.'" Id. (quoting Dillon v. Coles, 746 F.2d 998, 1006 (3d Cir. 1984)).

Given the lack of contrary opinions, and finding the Secretary's expert credible, I will adopt Mr. Staller's calculations, and find that Mr. Sanna is entitled to $56,121 in back pay, inclusive of pre-judgment interest and tax gross up.

### D.  Punitive Damages

The Secretary has moved for a "significant" punitive damages award. (Sec'y Br. 25–29, ECF No. 106.) Defendants respond that punitive damages are not available under the OSH Act, or alternatively should be limited. (Defs.' Br. 17–20, ECF No. 107.)

"Punitive or exemplary damages may be awarded in § 11(c) cases to compensate the complainant for harm suffered and deter future violations." Perez v. Clearwater Paper Corp., 184 F. Supp. 3d 831, 843 (D. Idaho 2016); see also Reich v. Cambridgeport Air Sys., Inc., 26 F.3d 1187, 1194 (1st Cir. 1994) ("We conclude, in accordance with the meaning of the same words as used in Franklin, that the statutory power to award 'all appropriate relief' gave the district court authority, where such relief is in fact appropriate, to award compensatory and even such traditional other relief as exemplary damages."). "Under OSHA, '[w]illfulness connotes defiance or such reckless disregard of consequences as to be equivalent to a knowing, conscious, and deliberate flaunting of the Act.'" Fagan v. City of Vineland, 22 F.3d 1296, 1324 (3d Cir. 1994) (quoting Frank Irey, Jr., Inc. v. Occupational Safety & Health Review Comm'n, 519 F.2d 1200, 1207 (3d

Cir. 1975), aff'd sub nom. Atlas Roofing Co. v. Occupational Safety & Health Review Comm'm, 430 U.S. 442 (1977)).

In assessing punitive damages, a court must "consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418 (2003). "[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Id. at 419 (quoting BMW of North Am., Inc. v. Gore, 517 U.S. 559, 575 (1996)). While the United States Supreme Court has declined "to impose a bright-line ratio which a punitive damages award cannot exceed," historically punitive damage awards have been upheld that provide for "sanctions of double, treble, or quadruple damages." Id. at 424–25.

Additionally, the wealth of a defendant may be considered to the extent that "what 'may be awesome punishment for an impecunious individual defendant . . . [may be] wholly insufficient to influence the behavior of a prosperous corporation.'" CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc., 499 F.3d 184, 193 (3d Cir. 2007) (quoting Cont'l Trend Resources, Inc. v. OXY USA Inc., 101 F.3d 634 (10th Cir. 1996)). However, wealth cannot be considered to "make up for the failure of other factors, such as 'reprehensibility,' to constrain significantly an award that purports to punish a defendant's conduct." Id. (quoting Campbell, 538 U.S. at 427–28). I note that the consideration of Defendants' wealth is discretionary and that the parties have not provided evidence of Defendants' wealth or financial health. Accordingly, I will not engage in

this consideration and will focus my analysis on the three guideposts enumerated by the United States Supreme Court.

As I conclude that punitive damages are available under the OSH Act, I find that punitive damages of $547,399 (i.e., $117,710 to Mr. Spillane and $429,689 to Mr. Sanna) are appropriate under the three guideposts.  See Perez v. Clearwater Paper Corp., 184 F. Supp. 3d 831, 843 (D. Idaho 2016).

In considering the first guidepost, I find that the evidence presented during both the liability and damages trials established that Mr. Lloyd willfully and deliberately retaliated against Mr. Spillane and Mr. Sanna and did so knowing full well that his conduct was illegal.  Ms. Kulp provided uncontradicted evidence that, based upon prior interactions with Defendants, Mr. Lloyd clearly knew that he was prohibited from terminating employees that exercise their rights under the OSH Act.  (See supra ¶ 35.)  Mr. Lloyd's willingness to illegally retaliate was starkly proven by evidence establishing that he believed that there was a "rat" in the plant who was feeding information to OSHA.  (Am. Trial Tr., 147:23–149:7, Mar. 29, 2019, ECF No. 97).  And, both Mr. Spillane and Mr. Sanna were terminated publicly in the plant and alarmingly close in time to OSHA events (i.e., Mr. Spillane was fired within five days of the OSHA inspection and Mr. Sanna was fired on the day that Defendants received the OSHA citations).  (Am. Trial Tr., 95:25–96:5, 109:15–112:15, Mar. 29, 2019, ECF No. 97.)  Under these circumstances, I conclude that Mr. Lloyd's deliberate flouting of the OSH Act was particularly reprehensible.

I next consider the second guidepost—whether there is any disparity between the actual or potential harm suffered by the plaintiff and the punitive damage award.  The United States Supreme Court "has not set 'concrete constitutional limits' on the permissible ratio between the actual or potential harm suffered by the plaintiff and the punitive damages awarded," but "[i]t has

cautioned, however, that 'in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.'" Austin v. Norfolk S. Corp., 158 F. App'x 374, 385 (3d Cir. 2005) (quoting State Farm Mut. Automobile Ins. Co v. Campbell., 538 U.S. 408, 424–25 (2003)). Thus, "a reviewing court must determine whether the amount of punitive damages awarded is 'both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered.'" Id. (quoting Campbell, 538 U.S. at 426). Ratios of up to 4-to-1 have been upheld by the Third Circuit and United States Supreme Court. See, e.g., In re Lansaw, 853 F.3d 657, 671 (3d Cir. 2017), cert. denied sub nom. Zokaites v. Lansaw, 138 S. Ct. 1001 (2018) ("The 4–to–1 ratio between the punitive damages award and the actual damages award ($10,100, including $7,500 for emotional distress and $2,600 in attorneys' fees) is in line with awards previously deemed acceptable by the Supreme Court.").

Here, the Secretary has established that Mr. Spillane and Mr. Sanna suffered actual harm of $117,710 and $429,689, respectively. (See supra ¶¶ 36–38.) These compensatory damages were virtually unchallenged by Defendants. (Id.) While it would be well within our discretion to impose punitive damages of 2-to-1, I find that 1-to-1 is appropriate in light of the significant compensatory damages. See Campbell, 538 U.S. at 425 ("When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff."). Accordingly, Defendants shall pay punitive damages of $117,710 to Mr. Spillane and $429,689 to Mr. Sanna.

Turning to third guidepost, I note that very little guidance exists in the OSHA retaliation context. At least one court has awarded punitive damages approximately equal to the

compensatory award, finding that the defendant fired the plaintiff to "chill the reporting of safety violations." See Perez v. Clearwater Paper Corp., 184 F. Supp. 3d 831, 844 (D. Idaho 2016). Most recently, the Honorable Mark Kearney of this district awarded punitive damages in an OSHA retaliation case. Acosta v. Fairmount Foundry, Inc., No. CV 17-4302, 2019 WL 2407492, at *8 (E.D. Pa. June 6, 2019). In Fairmount Foundry, Judge Kearney held that punitive damages were appropriate where the evidence showed that the employer knew that it could not retaliate against employers for making an OSHA complaint. Fairmount Foundry, 2019 WL 2407492 at *8 (imposing punitive damages of $10,000 in light of the $30,000 compensatory damages). While Judge Kearney awarded punitive damages of less than 1-to-1, I note that the compensatory damages here are significantly larger and the overwhelming evidence in this case establishes that Mr. Lloyd not only knew about the Act's prohibition against retaliation, but willfully disregarded that prohibition.

While I am not bound by these decisions, I find them persuasive in the absence of any contrary authority in the Third Circuit.[3] For the foregoing reasons, I find that punitive damages in the total amount of $500,000 are appropriate in this case to achieve the "goals of deterrence and retribution." Campbell, 538 U.S. at 425.

E.    **Injunctive Relief**

The Secretary also seeks to permanently enjoin Defendants under Section 11(c) from retaliating against other OSHA whistleblowers in the future, and requests that Defendants be

---

[3]      While Defendants argue that statutory construction prohibits such a reading, they cite to cases interpreting language of statutes other than the OSH Act. See, e.g., Barnes v. Gorman, 536 U.S. 181, 187–88 (2002) (holding that punitive damages may not be awarded in private suits brought under the ADA and Rehabilitation Act); Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 186 (3d Cir. 2009) (finding that punitive damages were not appropriate under the Individuals with Disabilities Education Act).

required to post an anti-retaliation notice at the plant for at least 60 days. (Sec'y Br. 29, ECF No. 106.)

"Section 11(c) exists to protect whistleblowers and support the purpose of the Act, namely creating a safe and healthy working environment." 29 U.S.C. § 651(b). A district court may promote this purpose by granting "'broad permanent injunctions against employers' who violate Section 11(c)." Acosta v. Fairmount Foundry, Inc., No. CV 17-4302, 2019 WL 2407492, at *15 (E.D. Pa. June 6, 2019) (quoting Perez v. Clearwater Paper Corp., 184 F. Supp. 3d 831, 844 (D. Idaho 2016)). I find that the requested injunctive relief is appropriate here in light of the fact that the jury found that (a) Mr. Spillane was terminated because of his engagement in a protected activity and (b) Mr. Sanna's engagement in a protected activity was a substantial reason for his termination. See id. (citing Marshall v. Wallace, No. 77-693, 1978 WL 18639, at * 5 (M.D. Pa. Dec. 22, 1978)).

Accordingly, Defendants are permanently enjoined from violating Section 11(c) and are ordered to post a court-approved anti-retaliation notice in a common area for a period of sixty days.

## IV.     CONCLUSION

Based on the foregoing, I find that Mr. Spillane is entitled to a back pay award in the amount of $117,710 (i.e., $92,563 in back pay, $13,763 in prejudgment interest, and $11,384 tax gross up), and Mr. Sanna is entitled to a back pay award in the amount of $373,568 (i.e., $281,691 in back pay, $37,357 in prejudgment interest, and $54,520 tax gross up) and a front pay award in the amount of $56,121. I also find that Defendants shall pay punitive damages of $100,000 to Mr. Spillane and $400,000 to Mr. Sanna. Accordingly, the total damages awarded equals $1,047,399.

I also find that Defendants are permanently enjoined from violating Section 11(c) and are ordered to post a court-approved anti-retaliation notice in a common area for a period of sixty (60) days.

An appropriate Order follows.